UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

Felix Charles Booker,                    )
                                         )
                    *Plaintiff*,         )
                                         )
v.                                       )          Case No.:3:11-CV-126-PLR-CCS
                                         )
Michael A. LaPaglia, *et al*,            )
                                         )
                    *Defendants*.        )

## Memorandum Opinion and Order

On February 12, 2010, law enforcement officers took Felix Booker to the emergency room at Methodist Medical Center because they suspected he had contraband hidden in his rectum. At the emergency room, without Mr. Booker's consent, a doctor administered drugs to paralyze Mr. Booker and render him unconscious, necessitating the use of an intubation tube to keep Mr. Booker alive. The doctor then used his fingers to probe Mr. Booker's rectum in search of contraband. Mr. Booker brought this suit seeking damages under 42 U.S.C. § 1983 for the violation of his constitutional rights. He also asserts a number of state-law claims.

Presently before the Court are cross-motions for summary judgment filed by Mr. Booker and the remaining defendants. Additionally, before the Court are Mr. Booker's motion for reconsideration of the dismissal of his federal claims against Nurse Jones and Methodist Medical Center, two motions to strike the second affidavit of Peter Alliman, and Methodist Medical Center's motion for leave to supplement its response in opposition to Mr. Booker's motion for summary judgment.

### 1. Factual Background

The facts have been described by a number of courts in both Mr. Booker's criminal case and the present civil case. The Court adopts the facts from the Sixth Circuit's opinion in Mr. Booker's criminal case as follows:

> At approximately 11:50 a.m. on [February] 12, 2010, Daniel Steakley, a K-9 officer with the Oak Ridge Police Department ("ORPD"), pulled over a car with expired tags. William Booker, the defendant's brother, drove the car; Felix Booker rode in the front passenger's seat. While speaking with William Booker,

Steakley smelled marijuana. William Booker denied that there were illegal drugs in the car and told Steakley he was free to search the vehicle. Prior to conducting the search, Steakley went to the police cruiser to check William Booker's driver's license status and to ascertain the existence of any outstanding warrants with the police dispatcher. As Steakley did so, he noticed Felix Booker "moving around, as if he was attempting to conceal something." This was not the first encounter between Felix Booker and Steakley. In 2009, Steakley had arrested Booker and recovered thirteen bags of marijuana that Booker hid in his crotch.

After completing the driver's license and outstanding warrants checks, Steakley utilized his trained drug-sniffing dog. The dog alerted near the front passenger-side door of the car where Felix Booker was seated. Steakley asked Booker to exit the car and patted him down. During the search, Steakley noticed that Booker "cl[e]nched his butt[ocks] together" when he patted him in that area, but the pat-down produced no drugs. However, Steakley did feel two large bulges in Booker's pockets which turned out to be large amounts of currency. During the search of the front passenger's seat, Steakley recovered three small plastic bags: one that contained .06 grams of marijuana, another that contained "a green plant-type residue," and a third covered with a "powder residue." Steakley also noticed marijuana "ground up into the floor" of the passenger-side seat.

Steakley arrested Felix Booker for felony possession of marijuana, despite being unable to recover enough marijuana to justify such an arrest under Tennessee law. *See* Tenn. Code Ann. § 39-17-418(b) (defining marijuana possession below 14.175 grams as a misdemeanor offense); § 40-7-118(b)(1) (authorizing citation, but not arrest, when an officer witnesses a misdemeanor). Steakley handcuffed Booker with his hands behind his back and placed him in the cruiser of another ORPD officer, Lewis Ridenour, so that Booker could be taken to the police station. Ridenour left the scene at approximately 12:19 p.m. The officers allowed William Booker to depart without issuing a citation for his expired plates and without trying to recover the marijuana in the floorboard.

Ridenour and Booker arrived at the police station at 12:21 p.m., followed shortly thereafter by Steakley. Steakley placed Booker in an interview room at the station. After Steakley read Booker his *Miranda* rights, Booker offered to forfeit the money Steakley found in Booker's pockets in order to be released on citation, while claiming that he earned the cash pouring concrete. Ridenour also noticed that Booker was "fidget[ing] and try[ing] to put his hands in the back of his pants," prompting Ridenour to move Booker's handcuffs from his back to his front. When Ridenour stepped out of the interview room for a moment, Booker

2

slammed the door shut and leaned against the door to barricade it. Ridenour, Steakley, and a police sergeant forced themselves into the interview room and wrestled Booker to the ground to regain control over him. The officers searched the room for contraband, patted down Booker a second time, and shook his pants by pulling them up until they were loose and jarring them to dislodge any articles jammed "inside of his pants or in [his] boxers." The officers did not find anything.

Ridenour next took Booker to the Anderson County Detention Facility in Clinton, Tennessee, arriving at approximately 1:20 p.m. According to Ridenour, Booker fidgeted throughout the drive. Upon arrival, Ridenour discussed Booker's situation with Jerry Shelton, a sheriff's deputy. The detention facility did not have a policy of strip searching all new detainees, and there is no indication whether Booker was going to be placed in the general population of the facility. However, based on suspicion, Shelton agreed to strip search Booker to determine if he was concealing contraband in his buttocks. Shelton and another officer took Booker into a small room where newly booked inmates typically showered, asked him to remove his clothing, and performed a visual inspection of his body. Shelton asked Booker to bend over and spread his buttocks; when Booker complied, Shelton claimed he could see "a small string protruding from [Booker's] anus." *Id.* at 109. After Shelton asked Booker about the object, Booker moved his hand to cover the area and tried to push the object further into his rectum. This led to another altercation during which Booker had to be restrained by officers. Shelton's supervisor ordered him to take Booker to a hospital immediately.

At 2:28 p.m., sheriff's deputies transported Booker to Methodist Medical Center in Oak Ridge. Booker was shackled and covered only in a blanket because the officers did not believe there was sufficient time to get him dressed. Shelton rode in the backseat alongside Booker, and said Booker was "squirmish" and "trying to go to the rear end of his body and force something further up into" his rectum. In the meantime, Officer Steakley had traveled separately to the hospital. Before Booker arrived, Steakley told Dr. Michael LaPaglia, the attending physician in the emergency room, that Steakley strongly suspected that Booker had drugs in his rectum.

This was not the first time that officers had brought a suspect to LaPaglia so that he could perform a digital rectal examination, that is, a procedure in which a physician inserts a finger into the patient's anus to probe the rectum. This was the

third time that officers with the Anderson County Sheriff's Department had sought LaPaglia's assistance with this type of procedure within three years.

At 2:50 p.m., the cruiser arrived at the hospital. Although Booker denied having anything in his rectum, had no physical symptoms, and had normal vital signs, LaPaglia proceeded without waiting. According to LaPaglia, the possibility of an individual hiding drugs in his rectum raised "a number of concerns" because "[t]he rectum is a part of the body that absorbs drugs very readily," and at a high dosage, such absorption may be fatal. LaPaglia asserts that this is true even when a person does not initially manifest symptoms of drug absorption, since "the drug could possibly not be absorbed enough at that time for [a physician] to see any signs of the drug." In the presence of Steakley, Ridenour, Shelton, and an unnamed officer, LaPaglia "explained to [Booker] what my position was as an emergency physician and that there was suspicion that he had some sort of drug in his rectum and that as an emergency physician I had to assure that he did not, and if he did, that I had to remove it because his life could be in danger."

Booker—still naked and handcuffed—denied hiding drugs in his rectum and refused to submit to a digital rectal examination. LaPaglia replied that Booker "really did not have a choice because if my suspicion was high enough to think that he had some sort of dangerous substance in his rectum, then it was my duty to get it out." LaPaglia recalled that the officers did not direct him to do anything to Booker. During the suppression motion hearing, LaPaglia reiterated that his "duty" was medical in nature:

> Q.  . . . . In a situation where you suspect somebody to have narcotics inside them, can you in such a life-threatening situation take any lack of consent at face value?
> A.  No.
> Q.  Why not?
> A.  As an emergency physician, if someone's life is in danger and . . . I feel that the person is not aware of the danger, then I have to take control of the situation and do what I need to do to save their life or prevent any harm to them.

LaPaglia warned Booker that if he did not cooperate, LaPaglia would administer muscle relaxants or, if necessary, paralyze Booker in order to perform the rectal examination.

4

At this point, LaPaglia claims that Booker gave oral consent to a rectal examination. There is nothing in the medical record indicating consent, and none of the other witnesses present (Registered Nurse Tammy Jones, Officer Steakley, Deputy Shelton, and Booker) testified that any consent was given. Not even LaPaglia contended that Booker consented to the paralyzation procedure.

LaPaglia first performed the rectal examination on Booker without medication. But Booker contracted his anal and rectal muscles while LaPaglia was attempting to examine him, preventing LaPaglia from inserting a finger in Booker's anus. As LaPaglia said, "If an individual does not want you to enter their rectum, you are not going to." *Id.* at 140. LaPaglia ordered a nurse to inject muscle relaxants into Booker's left buttock. On the second attempt, Booker remained uncooperative and LaPaglia could not complete the examination, but he could feel a foreign object inside Booker's rectum, convincing LaPaglia that completion of the rectal examination was imperative. Finally, LaPaglia directed an emergency room nurse, Tammy Jones, to administer a sedative and a paralytic agent to Booker intravenously, and had him intubated to control his breathing. At 4:12 p.m., Booker was intubated. He remained intubated for about an hour, unconscious for twenty to thirty minutes, and paralyzed for seven to eight minutes. While Booker was paralyzed, LaPaglia removed a rock of crack cocaine, greater than five grams, from Booker's rectum. LaPaglia then turned over the crack rock to Officer Steakley, who took it for evidence.

*United States v. Booker*, 728 F.3d 535, 537-40 (6th Cir. 2013).

Because it addressed Mr. Booker's case on appeal from his criminal conviction, the Sixth Circuit did not consider some facts necessary to resolving the present civil action.[1] Those relevant facts are as follows:

Though the defendants emphasize the exigent nature of the situation, Mr. Booker contends (and the defendants do not appear to deny) that the officers did not immediately take him to the hospital after Deputy Shelton allegedly saw a string protruding from Mr. Booker's anus.[2] Instead, after the strip search, Mr. Booker was placed naked in a strap chair for 15-20 minutes while Deputy Shelton's supervisor made a phone call to an assistant district attorney

---

[1] For example, it was unnecessary for the Sixth Circuit to consider *who* violated Mr. Booker's Fourth Amendment right against unreasonable search and seizure. A finding of any constitutional violation was sufficient to vacate his conviction.
[2] No string was recovered when Dr. LaPaglia searched Mr. Booker's rectum.

general.  It was only after he made the phone call that Deputy Shelton's supervisor ordered him to take Mr. Booker to the hospital.[3]

Officer Ridenour contends he left the hospital to go back on duty immediately after Dr. LaPaglia told Mr. Booker about his options and unsuccessfully attempted the first DRE.  In support of his contention, Officer Ridenour submitted copies of dispatch records indicating he left Methodist around 14:59, and did not return.  While Mr. Booker does not appear to dispute that Officer Ridenour was not at the hospital when Dr. LaPaglia paralyzed Mr. Booker and conducted the final search, he does contend Officer Ridenour helped the other officers hold him down while Nurse Jones gave him a shot of muscle relaxer.

## 2.  Procedural History

After a federal grand jury indicted Mr. Booker for possession with intent to distribute more than five grams of crack cocaine, he moved to suppress the crack, arguing it was obtained in violation of his Fourth Amendment rights.  Mr. Booker claimed Officer Steakley lacked probable cause to arrest him for marijuana possession, and his post-arrest treatment was unreasonable under the Fourth Amendment.  The magistrate judge issued a report and recommendation finding the traffic stop and arrest complied with the Fourth Amendment.  He also held the DRE was lawful because it was not a "search" for the purposes of the Fourth Amendment.  Finally, he concluded even if the DRE was a "search," Dr. LaPaglia and the officers' actions were reasonable under the circumstances.  The district court adopted the magistrate's recommendation in full.  *United States v. Booker*, 2010 WL 4884675, at *5-8 (E.D. Tenn. Nov. 24, 2010).

Mr. Booker appealed the district court's ruling to the Sixth Circuit, which held the search at the hospital violated Mr. Booker's Fourth Amendment rights, and vacated Mr. Booker's conviction and sentence.  *United States v. Booker*, 728 F.3d at 548.  The Sixth Circuit did not address Mr. Booker's other suppression arguments—that the arrest was not supported by probable cause and that the police did not have a clear indication that contraband would be found in his rectum.  *Id.* at 548 n.2.  On remand, the district court dismissed the case against Mr. Booker.

---

[3] Mr. Booker claims the officers did not use their lights or sirens while transporting him to the hospital—a fact he offers as further support that the circumstances were not as exigent as the defendants now contend.

6

Mr. Booker filed this civil action in the Circuit Court for Anderson County, Tennessee on February 11, 2011, asserting claims under 42 U.S.C. § 1983 and Tennessee state law. In March 2011, the case was removed to this Court. The Court dismissed Mr. Booker's § 1983 claims against Sheriff Paul White and Police Chief David Beams in their official capacities because they were redundant to the claims asserted against Anderson County and Oak Ridge. The Court also dismissed the § 1983 claims against Methodist Medical Center, Southeastern Emergency Physicians, and Team Health, finding those entities were not state actors, and an employer cannot be held vicariously liable under § 1983. Finally, the Court dismissed the § 1983 claim against Nurse Jones because the Court found she was not a "state actor" for the purposes of the Fourth Amendment. The Court reached this conclusion because "[a]ll of Nurse Jones's actions of which Mr. Booker complains were performed at the request of Dr. LaPaglia and not at the request of the police. . . . Given Nurse Jones's position and the facts of the case, the connection between Nurse Jones and the police is too attenuated to find that she was a state actor." [R. 97, p. 6].

The Court also dismissed Mr. Booker's claims based on violations of the Tennessee Constitution because Tennessee does not recognize a private right of action for violations of its constitution. *Id.* at p. 6. Mr. Booker asked the Court to decline to exercise its supplemental jurisdiction over the state law claims, however, the Court found his argument premature because many of the claims are closely intertwined with issues that were currently before the Sixth Circuit. For the same reason, the Court stayed the rest of the case pending the Sixth Circuit's ruling. [R. 97, p. 5].

After the Sixth Circuit ruled in Mr. Booker's criminal case, the Court lifted the stay, [R. 134], and all the remaining parties, including Mr. Booker, filed new or renewed motions for summary judgment or partial summary judgment. [R. 135, 136, 144, 153, 164, and 172]. Mr. Booker also filed a motion urging the Court to reconsider its dismissal of the § 1983 claims against Nurse Jones and Methodist Medical Center. [R. 156].

The Court held a hearing on February 11, 2014, where the parties presented arguments on the pending summary judgment motions. [R. 262, 280]. During the hearing, the Court instructed the parties to file supplemental briefs regarding the preclusive effect of Mr. Booker's criminal case and the effect granting qualified immunity to the individual defendants would have on Mr.

Booker's § 1983 claims against the government defendants. The parties filed their supplemental briefs, and the summary judgment motions are ripe for consideration.[4]

### 3. Preliminary Matters

#### A. Motion to Strike

Dr. LaPaglia, Nurse Jones, and Methodist Medical Center have moved to strike the Second Affidavit of Peter Alliman. [R. 250, 251]. Mr. Alliman's Second Affidavit attaches portions of Susan Harris' deposition transcript from a different lawsuit that the defendants contend are irrelevant and inadmissible. [R. 247]. The Court has reviewed the motions to strike and found Mr. Alliman's Second Affidavit is not necessary to reaching a decision on the pending motions. Accordingly, the Court need not render an opinion on the affidavits' admissibility. The motions to strike will be denied as moot.

#### B. Motion for Leave to Supplement Response

Methodist Medical Center has moved for leave to supplement its response in opposition to Mr. Booker's motion for summary judgment under Local Rule 7.1 to address a dispute over Dr. LaPaglia's employment status with Methodist. [R. 252]. Methodist's motion will be granted. The Court will consider their supplemental response along with the rest of the filings in ruling on the present motions.

#### C. Collateral Estoppel

At the February 11, 2014 hearing held on the motions for summary judgment, the Court directed the parties to file supplemental briefs addressing the preclusive effect of the issues decided in Mr. Booker's criminal case. Oak Ridge, Anderson County, and the police defendants argue Mr. Booker is collaterally estopped from litigating the reasonableness of the traffic stop, his arrest, or any other event leading up to the unconstitutional search at the hospital.

Collateral estoppel may be applied to bar re-litigation of an issue when: (1) the precise issue was raised and actually litigated in prior proceedings; (2) determination of the issue was necessary to the outcome of the prior proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the party against whom collateral is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding. *Cobbins v. Tenn. Dept. of*

---

[4] This case was reassigned from Judge Campbell to the undersigned by order of Chief District Judge Thomas A. Varlan on May 2, 2014. [R. 281].

*Transportation*, 566 F.3d 582, 589-90 (6th Cir. 2009) (citing *NAACP, Detroit Branch v. Detroit Police Officers Ass'n*, 821 F.2d 328, 330 (6th Cir. 1987)).

In Mr. Booker's case, the Sixth Circuit vacated his conviction on the grounds that the paralysis and digital rectal search conducted without Mr. Booker's consent violated Mr. Booker's Fourth Amendment rights. Because Mr. Booker's other arguments were not necessary to its finding, the Sixth Circuit did not consider them. Nevertheless, many of the defendants contend, "[o]f course, there has been a final judgment on the merits." [R. 268, p. 7].

Their position overlooks the fact that the Sixth Circuit vacated Mr. Booker's judgment. A judgment that is vacated "is deprived of its conclusive effect as to collateral estoppel." *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985) (collecting cases). When a conviction is reversed, even if on grounds having no bearing on the validity of the findings of fact, the reversal "vacates the judgment entirely, technically leaving nothing to which we may accord any preclusive effect." *Id. See also Erebia v. Chrysler Plastic Products Corp.*, 891 F.2d 1212, 1215 (6th Cir. 1989) ("Where the prior judgment, or any part thereof, relied upon by a subsequent court has been reversed, the defense of collateral estoppel evaporates.") (collecting cases). Because Mr. Booker's conviction was vacated, collateral estoppel may not be used to preclude Mr. Booker (or any other party in this case) from relitigating any of the issues raised in his criminal trial.

### 4. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Co., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002). Courts may not resolve genuine disputes of fact in favor of the movant. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014) (vacating lower court's grant of summary judgment for "fail[ing to] adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor") (internal quotations and citations omitted).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the fact finder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### 5. Discussion

#### A. Constitutional Violations

##### i. Traffic Stop and Arrest

Mr. Booker contends the traffic stop violated his Fourth Amendment rights; however, even viewing the facts in a light most favorable to Mr. Booker, the totality of the circumstances surrounding the stop indicate the traffic stop did not violate Mr. Booker's Fourth Amendment rights.

Officer Steakley initiated the traffic stop because the vehicle's tags were expired. When Officer Steakley smelled marijuana emanating from the car, the investigation transformed from a simple traffic stop for expired tags, and probable cause existed for Officer Steakley to search the car without a warrant. *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) (citing *Carroll v. United States*, 267 U.S. 132 (1925)). *See also United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002) ("an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause"). Moreover, William Booker gave Officer Steakley permission to search the vehicle—a fact Mr. Booker does not dispute. The subsequent use of a drug dog did

10

not make the stop or search excessively intrusive or dramatically extend the duration of the stop. In fact, a trained drug dog sniffing a car is not even a "search" for Fourth Amendment purposes. *United States v. Place*, 462 U.S. 696, 707 (1983). Considering the totality of the circumstances, Mr. Booker has failed to plead sufficient facts to survive summary judgment, and his Fourth Amendment claims relating to the traffic stop will be dismissed.

Mr. Booker appears to contend Officer Steakley violated his Fourth Amendment rights when he patted him down and seized two bundles of currency from his pockets. As discussed above, the dog's alert along with the smell of marijuana emanating from the vehicle gave the officers "at least reasonable and articulable suspicion" that the vehicle contained illegal drugs. *United States v. Ayers*, 2006 WL 2672571, at *2 (E.D. Tenn. Sept. 8, 2006). When police reasonably suspect an individual has drugs, they are "entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions." *United States v. Health*, 259 F.3d 522, 530 (6th Cir. 2001). An officer may perform a pat down of a driver or passenger upon reasonable suspicion that they may be armed and dangerous. *Knowles v. Iowa*, 525 U.S. 113, 118 (1998). An officer "may seize non-threatening contraband detected by touch during a protective pat-down search if the search stays within the bounds marked by *Terry*." *United States v. Walker*, 181 F.2d 774, 778 (6th Cir. 1999) (citing *Minn. Dickerson*, 508 U.S. 366 (1993)). Accordingly, Officer Steakley's pat-down search of Mr. Booker was constitutional. As the Magistrate opined in his report and recommendations, "failure to [pat Mr. Booker down] would have been irresponsible." *United States v. Booker*, Case No. 3:10-cr-44, R. 38, p. 25.

Mr. Booker finally argues Officers Steakley and Ridenour lacked probable cause to arrest him without a warrant. Mr. Booker notes that T.C.A. § 40-7-118(b) requires police officers to issue citations in lieu of custodial arrests for misdemeanor offenses. Possession of a small amount of marijuana (less than half an ounce) is a misdemeanor under Tennessee law. T.C.A. § 39-17-418. Because Officer Steakley only recovered 0.06 grams of marijuana (a misdemeanor amount) from the area of the vehicle where Mr. Booker was sitting, the argument concludes, the officers lacked probable cause to arrest Mr. Booker.

It is well established that a police officer may constitutionally arrest an individual without a warrant when there is probable cause to believe the arrestee has committed a criminal offense in the officer's presence. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to

believe that a criminal offense has been or is being committed."). Moreover, a warrantless arrest is constitutional even if the officer only has probable cause to believe the offender committed a "very minor criminal offense." *Atwater v. City of Lago Vista*, 532 U.S. 318, 322 (2001). Because the officers had probable cause to believe Mr. Booker possessed illegal drugs (even in a small amount), they did not violate his constitutional rights by arresting him. Furthermore, Mr. Booker's reliance on T.C.A. § 40-7-118(b) is misplaced. The Sixth Circuit has expressly rejected the argument that a warrantless arrest necessarily violates the Fourth Amendment if it violates Tennessee state law. *United States v. Harness*, 453 F.3d 752 (6th Cir. 2006).

Because, even viewing the evidence in a light most favorable to Mr. Booker, the initial traffic stop was valid; Officer Steakley had probable cause (and permission) to search the vehicle based on the smell of marijuana (noticed by Officer Steakley and Argo); and the officers had probable cause to arrest Mr. Booker based on his possession of a small amount of marijuana, no Fourth Amendment violations occurred leading up to and including Mr. Booker's arrest. Mr. Booker's § 1983 claims for any actions leading up to and including his arrest will be dismissed.

### ii. Strip Search

Mr. Booker's response to Deputy Shelton and Anderson County's joint motion for summary judgment makes it clear he asserts no constitutional claims against Deputy Shelton or Anderson County relating to improper arrest, seizure, or prosecution. [R. 236, p. 3]. Additionally, Mr. Booker agrees the defendants were entitled to strip search him at the Anderson County Detention Facility. *Id.* To the extent Mr. Booker's complaint raises any claims contrary to these positions, they will be dismissed.

### iii. Hospital Search

The crux of Mr. Booker's case is his trip to the hospital where he was paralyzed, intubated, and anally probed without a warrant and against his will. The Sixth Circuit clearly held in Mr. Booker's criminal case that his Fourth Amendment right against unreasonable searches was violated; however, that holding is not binding in the present case. In resolving this civil proceeding it is necessary to consider not only whether Mr. Booker's constitutional rights were violated, but which parties bear responsibility for the alleged violations. Moreover, because the individual defendants are claiming qualified immunity, the Court must also consider whether the right at issue was clearly established at the time of the search.

### a) Clearly Established

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stoudemire v. Michigan Dept. of Corrections*, 705 F.3d 560, 567 (6th Cir. 2013) (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008)). That is, at the time of the search, were the rights asserted clearly established by the decisions of the Supreme Court or the Sixth Circuit such that the defendants could not reasonably have thought their actions were consistent with the Mr. Booker's rights? *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988) (citing *Anderson v. Creighton*, 483 U.S. 635 (1987)); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("the salient question that the [court] should have asked is whether the state of the law [at the time of the incident] gave respondents fair warning that [the plaintiff's] alleged treatment was unconstitutional"); *Ramirez v. Webb*, 835 F.2d 1153, 1156 (6th Cir. 1987) ("[Defendants] have qualified immunity unless plaintiffs' 'rights were so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'") (quoting *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987)).

For conduct to violate clearly established law, a plaintiff need not cite cases involving factually identical conduct. In fact, the Supreme Court has expressly rejected the requirement that previous cases be "fundamentally similar" or even "materially similar." *Hope v. Pelzer*, 536 U.S. at 741. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* General statements of the law are capable of giving fair and clear warning when a general constitutional rule applies "with obvious clarity" to the conduct in question, even though "the very action in question has [not] previously been held unlawful." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. at 640) (holding that handcuffing a shirtless prisoner to a hitching post in the sun for seven hours was so obviously in violation of the prisoner's Eighth Amendment rights that the defendants had fair warning their conduct was unconstitutional.).

Two Supreme Court cases, *Rochin v. California*, 342 U.S. 165 (1952), and *Winston v. Lee*, 470 U.S. 753 (1985), establish constitutional rules "with obvious clarity" sufficient to give fair warning that a search under the circumstances presented in this case is unlawful. The Sixth

Circuit has already analyzed *Rochin* and *Lee* in the context of Mr. Booker's search, and this Court adopts their analysis as follows:

> In *Rochin*, three deputy sheriffs forced their way into Rochin's bedroom based on information that Rochin was selling narcotics. The deputies saw two capsules sitting on his nightstand and asked Rochin whom the capsules belonged to. In response, Rochin grabbed the capsules and swallowed them. The deputies then handcuffed Rochin and took him to the hospital where the police directed a doctor to force "an emetic solution through a tube into Rochin's stomach against his will." [*Rochin v. California*, 342 U.S. at 166]. The stomach pumping caused Rochin to vomit up the two capsules, which were found to contain morphine. The Supreme Court held that Rochin's conviction for possessing these morphine tablets was so fundamentally unfair as to violate the Due Process Clause. The Court said the deputies' conduct "shocks the conscience" and was "too close to the rack and screw to permit of constitutional differentiation." *Id*. at 172[].

> The similarity between the present case and *Rochin* is apparent. While factual and legal differences exist, what shocked the conscience in *Rochin* was the use of the forced emetic. Forced paralysis, intubation, and digital rectal examination is at least as shocking as stomach pumping. The main legal difference is that *Rochin* analyzed the practice under the "fundamental fairness" standard of the Due Process Clause of the Fourteenth Amendment, while Booker bases his challenge on the Fourth Amendment's prohibition of "unreasonable searches," which applies to the states via the Due Process Clause of the Fourteenth Amendment. *See Wolf v. Colorado*, 338 U.S. 25, 28, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). However, this difference is immaterial because investigative conduct that would shock the conscience for purposes of the Due Process Clause is "unreasonable" for purposes of the Fourth Amendment. As the Supreme Court explained in *County of Sacramento v. Lewis*, 523 U.S. 833, 849 n. 9, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), under modern doctrine, *Rochin* "would be treated under the Fourth Amendment, albeit with the same result." In short, the present case cannot be distinguished from *Rochin* in any meaningful way. Booker was subjected to an unreasonable search in violation of his Fourth Amendment rights.

> This conclusion is squarely supported by the Supreme Court's holding in *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). In *Lee*, a shopkeeper wounded his assailant during an attempted robbery. Lee was soon found in the neighborhood with a bullet wound to his shoulder and was arrested by the police. The police went to state court to seek an order directing Lee to undergo surgery. The Supreme Court concluded that requiring Lee to undergo

surgery involving general anesthesia would be an unreasonable search. *See id*. at 755–56, 767, 105 S.Ct. 1611.

In reaching the conclusion that the forced surgery would be unconstitutional, the Court found that the following three factors weighed against its substantive reasonableness: (1) "the extent to which the procedure may threaten the safety or health of the individual," (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," and (3) "the community's interest in fairly and accurately determining guilt or innocence." *Id*. at 761–62, 105 S.Ct. 1611. These factors, taken together, weigh even more strongly against the reasonableness of the procedure used on Booker.

First, the degree of risk is at least comparable to that in *Lee*, which involved a general anesthetic but not a paralyzing agent. In *Lee*, the Court of Appeals had the benefit of evidence—including an x-ray confirming the presence of the bullet—presented at three hearings. Based on this evidence, the Court of Appeals had said the risk to Lee was "minimal." The Supreme Court noted uncertainty about the medical risk and stated that "the very uncertainty militates against finding the operation to be 'reasonable.' " *Id*. at 764 & n. 7, 766, 105 S.Ct. 1611. In this case, Booker emphasizes the risk of the paralysis and intubation while the Government emphasizes the routine nature of the procedure in an emergency room. As in *Lee*, although the medical risks are apparently not extremely high, they are the subject of dispute, and that very uncertainty may weigh against a finding of reasonableness. *See id*.

Second, in comparison with *Lee*, the affront to human dignity in this case is compelling. The Court in *Lee* reasoned:

> When conducted with the consent of the patient, surgery requiring general anesthesia is not necessarily demeaning or intrusive. In such a case, the surgeon is carrying out the patient's own will concerning the patient's body and the patient's right to privacy is therefore preserved. In this case, however, the Court of Appeals noted that the Commonwealth proposes to take control of respondent's body, to "drug this citizen—not yet convicted of a criminal offense—with narcotics and barbiturates into a state of unconsciousness," and then to search beneath his skin for evidence of a crime. This kind of surgery involves a virtually total divestment of respondent's ordinary control over surgical probing beneath his skin.

15

*Id.* at 765, 105 S.Ct. 1611 (quoting *Lee v. Winston*, 717 F.2d 888, 901 (4th Cir.1983)). Here, there is not only a probe into a tranquilized subject. Booker, naked and handcuffed, was paralyzed, intubated, and anally probed without his consent. As the Fifth Circuit stated in *United States v. Gray*, 669 F.3d 556, 565 (5th Cir.2012), this type of intrusion "is one of the greatest dignitary intrusions that could flow from a medical procedure." "Such a procedure is degrading to the person being probed—both from his perspective and society's." *Id*., *vacated on other grounds*, ‒‒‒ U.S. ‒‒‒‒, 133 S.Ct. 151, 184 L.Ed.2d 2 (2012). The affront to personal dignity in Booker's case is categorically greater than what was not permitted in *Lee*.

Third, it is true that society's interest in determining guilt or innocence is "of course of great importance." *Lee*, 470 U.S. at 762, 105 S.Ct. 1611. Yet, in *Lee*, the court found retrieval of the bullet not to be a compelling need because other evidence existed. Id. at 765–66, 105 S.Ct. 1611. This result can be contrasted with another relevant Supreme Court case, *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), which held blood tests used on suspected drunk drivers to be reasonable. Such blood tests are "highly effective ... [e]specially given the difficulty of proving drunkenness by other means." *Lee*, 470 U.S. at 762–63, 105 S.Ct. 1611. The present case is closer to *Lee* than to *Schmerber* in this respect: it is easier for society to prosecute drug possession crimes without the need for medical procedures than it is to prosecute DUI crimes. Furthermore, while reasonableness under the Fourth Amendment is not a least-intrusive-means test, see *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 663, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), it is relevant that far less intrusive means were available to investigate whether Booker was hiding contraband in his rectum. For example, the established policy of the United States Customs and Border Protection is first to attempt an x-ray to confirm the presence of contraband. If further medical examination is necessary, officers consider whether to engage in a monitored bowel movement, and only engage in an involuntary body cavity search after obtaining a court order. *See* U.S. Customs and Border Patrol, CIS HB 3300–04B, *Personal Search Handbook* (2004), *available at* http://foiarr.cbp.gov/streamingWord.asp?i=7. In this case, LaPaglia testified that he could have done an x-ray. See Supp. Hr'g Tr., 138–39, July 18, 2010. When less intrusive means to investigate were available but not used and when the prosecution has other ways to establish guilt, this diminishes the weight that should be given to using an involuntary and invasive medical procedure to further society's interest in fairly and accurately determining guilt or innocence.

The factors applied by the Supreme Court in *Lee* thus compel the conclusion that the search in this case violated the Fourth Amendment. In addition, when there was time to obtain a court order and the police declined to seek one, the suspect's privacy interests should be given particular solicitude.

*United States v. Booker*, 728 F.3d at 545-48.

The Supreme Court's holdings in *Rochin* and *Lee* provide the defendants with fair warning that a search under the circumstances alleged in this case would violate Mr. Booker's Fourth Amendment right against unreasonable searches. "Based on the circumstances of this case, a reasonably well-trained officer and physician would have known that the search was unlawful." *Id.* at 548.

In response to the Sixth Circuit's holding in Mr. Booker's criminal case, the defendants argue because five judges considered whether the search violated Mr. Booker's Fourth Amendment rights and only two found a constitutional violation, the right was not clearly established. If three of five federal judges got it wrong, how could the law be clearly established such that a reasonable officer would know he was violating Mr. Booker's constitutional rights? At first glance, the defendants' argument appears compelling; however, in the end it is not persuasive.

As an initial matter, Judge Gibbons' dissent did not state that a search under the circumstances alleged is constitutionally permissible. Instead, Judge Gibbons' dissent takes issue with the majority's conclusion that Dr. LaPaglia was a state actor for Fourth Amendment purposes. *United States v. Booker* 728 F.3d at 548-49. Judge Gibbons argues that because Mr. Booker did not develop a record in the district court about Dr. LaPaglia and the officers' intent behind the search, the majority should not reach the conclusion that the officers brought Mr. Booker to Dr. LaPaglia for the purpose of violating his rights. *Id.* Making assumptions about the officers' or Dr. LaPaglia's intent is especially problematic, Judge Gibbons contends, because the appellate court is obligated to review the record in the light most favorable to the party that prevailed below—the government. *Id.* (citing *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008)). Because Judge Gibbons would decide the "state actor" issue differently, she did not reach the question of whether Dr. LaPaglia's search was reasonable. *Id* at 549.

The record and findings of fact in Mr. Booker's criminal proceeding, upon which Judge Gibbons based her dissent, are not the same as the record in the present civil proceeding.

Though identical events are the subject of both cases, the standard of review is precisely the opposite in this case. Here, the Court must view the facts in the light most favorable to the non-movant—Mr. Booker. Because he will have the opportunity to engage in discovery and develop a record in this civil proceeding, he may be able to establish the facts necessary to attribute Dr. LaPaglia's actions to the state, at which point Judge Gibbons' dissent will be inapposite.

The defendants' reliance on the Magistrate's report and recommendation and District Court's opinion is misplaced for two reasons. *First*, the proper inquiry for qualified immunity is whether the right at issue was clearly established *at the time* of the alleged constitutional violation. Judge Guyton's report and recommendation and Judge Jordon's opinion were issued subsequent to Mr. Booker's search and therefore cannot serve as precedent for the police to consider in deciding whether or not to execute a warrantless search of Mr. Booker's rectum. *Second*, the Sixth Circuit has since clearly vacated the opinions, citing decades old cases establishing Mr. Booker's right to be free from warrantless searches inside his body.

The defendants cite *Pearson v. Callahan*, 555 U.S. 223 (2009) for the proposition that, when there is a conflict of judicial authority, an officer cannot be expected to choose the winning side of the controversy. But *Pearson* is readily distinguishable from the present case. In *Pearson*, police conducted a warrantless search of a suspect's house when the suspect sold methamphetamine to an undercover informant who the suspect had voluntarily admitted to the premises. *Id.* at 227. In a § 1983 action alleging the police violated the plaintiff's Fourth Amendment rights by entering his home without a warrant, the district court noted that other courts had adopted the "consent-once-removed" doctrine, which allows police to enter a home without a warrant if consent to enter has already been granted to an undercover officer or informant. *Id.* at 229. The district court granted qualified immunity because it found the officers could reasonably have believed the consent-once-removed doctrine authorized their conduct. *Id.* On appeal, the Tenth Circuit held the consent-once-removed doctrine does not extend to cover informants in the same manner as undercover officers. *Id.* It concluded the defendants could not reasonably have believed their conduct was lawful because they knew they did not have a warrant; the suspect did not consent to their entry; and consent to entry of the informant could not reasonably be interpreted to extend to the police. *Id* at 230.

The Supreme Court reversed the Tenth Circuit, holding the entry did not violate clearly established law. *Id.* at 243. According to the Supreme Court, the consent-once-removed

doctrine had gained acceptance in the lower courts at the time of the search. *Id.* It had been considered by numerous circuit courts and state supreme courts and had been accepted by them all. In fact, prior to the Tenth Circuit's decision in *Pearson*, no court of appeals had issued a contrary decision. *Id.* (collecting cases). The Supreme Court concluded the officers were entitled to rely on the cases from other jurisdictions when the Tenth Circuit had yet to rule on the constitutionality of consent-once-removed entries.

*Pearson* is readily distinguishable from the present case. The present case does not involve officers executing a search under circumstances widely held by other circuit courts to be constitutional only to later be told by the court of appeals that the other courts were wrong and the officers' reliance on them was unreasonable. In this case, controlling precedent from the United States Supreme Court clearly established a search under the circumstances alleged by Mr. Booker violates a person's Fourth Amendment right against unreasonable searches. Contrary holdings by the magistrate and district judges in Mr. Booker's criminal case, which were vacated by the Sixth Circuit, do not establish a split in authority within the Sixth Circuit on which the officers or Dr. LaPaglia could have reasonably relied.

### b) Doctor LaPaglia

Dr. LaPaglia contends he cannot be held liable for any alleged constitutional violations because he was a private actor not subject to the Fourth Amendments' prohibition of unreasonable searches. In the alternative, should Dr. LaPaglia be found a state actor, he contends he is entitled to qualified immunity.

The Supreme Court has made clear the Fourth Amendment is "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (internal quotation marks omitted). Whether a private individual's conduct is imputed to the government depends on the degree of the government's participation in the private party's activities—a question to be determined "in light of all the circumstances." *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 614-15 (1989) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)). "A private individual does not act as a government agent where the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution." *United States v. Robinson*, 390 F.3d 853, 872 (6th Cir. 2004) (internal quotation marks omitted);

19

*see also United States v. Foley*, 23 F.3d 408, 1994 WL 144445, at *3 (6th Cir. 1994) ("[I]f the intent of the private party conducting the search is independent of the official desire to collect evidence in a criminal proceeding, then the private party is not acting as a state agent.").

Dr. LaPaglia argues the intent of the police officers in taking Mr. Booker to the hospital was concern for his health, and Dr. LaPaglia acted solely out of concern for Mr. Booker's safety and well-being.[5] Dr. LaPaglia has filed an affidavit contending he took no instructions from the police and his intent was in no way to assist the police in the collection of evidence; however, an affidavit does not conclusively establish Dr. LaPaglia's intent, and the circumstances alleged are sufficient to create a genuine question of material fact. Circumstances evidencing possible intent to assist the police include, but are not limited to, Dr. LaPaglia's past record of searching Anderson County's prisoner's rectums, Mr. Booker's lack of consent (it is difficult to imagine a doctor without consent who would forcibly paralyze, intubate, and anally probe a patient without the reassuring presence of the police implicitly authorizing the search), and Dr. LaPaglia's failure to offer Mr. Booker the option of using the toilet (which would have lost the evidence).[6]

In the event he is held to be a state actor, Dr. LaPaglia's only remaining defense is one of qualified immunity. Dr. LaPaglia thoroughly briefs his argument that he is entitled to assert qualified immunity; however, he never actually analyzes the elements of a qualified immunity defense. Assuming for the sake of argument Dr. LaPaglia is entitled to assert qualified immunity,[7] he is only entitled to summary judgment if the undisputed facts (interpreted in the light most favorable to Mr. Booker) establish, as a matter of law, either no constitutional violation occurred or the constitutional right at issue was not clearly established at the time of the violation. *Eggleston v. Short*, 560 Fed. App'x. 561, 562-63 (6th Cir. 2014) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Eldridge v. City of Warren*, 533 Fed. App'x. 529, 532 (6th Cir. 2013)).

---

[5] Dr. LaPaglia adamantly contends his actions were guided by his knowledge of the potentially lethal effect of absorbing crack cocaine through the rectum. [R. 216, p. 1-2] ("Dr. LaPaglia . . . knew that crack cocaine . . . in a patient's rectum could cause a sudden and potentially fatal cardiac arrhythmia, stroke or heart attack."). This contention is inapposite. Until Dr. LaPaglia forcibly drugged Mr. Booker and performed an unconsented search, he had no way of knowing what*, if anything*, was inside Mr. Booker's rectum.

[6] "The doctor's failure to present such a choice showed that he was acting at least in part to ensure retrieval of the hidden drugs." *United States v. Booker*, 728 F.3d at 545.

[7] A position the plaintiff disputes.

Because Mr. Booker has presented the Court with sufficient facts to create a genuine dispute as to whether Dr. LaPaglia violated his Fourth Amendment right against unreasonable searches, and because Mr. Booker's right was clearly established at the time of the search, Dr. LaPaglia is not entitled to qualified immunity. Dr. LaPaglia and Mr. Booker's cross motions for summary judgment on the Fourth Amendment claim will be denied.

### c) Officer Steakley and Deputy Shelton

Officer Steakley and Deputy Shelton argue they cannot be liable for violations of Mr. Booker's Fourth Amendment rights because: (1) there was no violation of Mr. Booker's Fourth Amendment Rights; and (2) they are entitled to qualified immunity. Officer Steakley and Deputy Shelton, however, have failed to establish a lack of disputed material facts. Mr. Booker has pled he was taken from the Anderson County Detention Facility (handcuffed and naked with nothing but a small blanket tossed over his shoulders) to Methodist Medical Center where the officers presented Mr. Booker to Dr. LaPaglia and looked on while Dr. LaPaglia paralyzed, intubated, and anally probed Mr. Booker without consent. As the Sixth Circuit explained in Mr. Booker's criminal case, the police cannot escape liability by using a third party to engage in acts the police are constitutionally prohibited from engaging in. *United States v. Booker*, 728 F.3d at 540-45.

Because a jury could reasonably find Officer Steakley and Deputy Shelton's actions violated Mr. Booker's Fourth Amendment rights, and because the right to be free of warrantless searches probing the inside of a suspect's body is clearly established, Officer Steakley and Deputy Shelton's motions for summary judgment will be denied with respect to the hospital searches. Because the facts are in dispute, Mr. Booker's motion for summary judgment will also be denied with respect to this claim.

### d) Officer Ridenour

Officer Ridenour argues he is in a different position than Officer Steakley and Deputy Shelton. According to Officer Ridenour, Mr. Booker arrived at Methodist at 14:50 and his vital signs were immediately taken. Officer Ridenour was present when Dr. LaPaglia initially spoke with Mr. Booker and "discussed what the possible ramifications were and what the procedures could be, a, b, c. . . ." [Suppression Hearing transcript, p. 89]. Officer Ridenour contends Mr. Booker gave verbal consent to the initial rectal exam, and Officer Ridenour watched Dr. LaPaglia's first unsuccessful attempt to perform the search. At this point, after only being at the

hospital for nine minutes, Officer Ridenour claims he left. To support this claim, Officer Ridenour submitted dispatch records evidencing the time he left to resume his normal police duties and that he did not return to the hospital. It appears there is no dispute that Officer Ridenour left before Mr. Booker was paralyzed and intubated.

Despite having left before the paralysis, intubation, and final search, Mr. Booker has pled sufficient facts to survive summary judgment. He contends prior to leaving the hospital, Officer Ridenour and the other officers held him down while Nurse Jones gave him the shot of muscle relaxer. Considering the timeline alleged by Officer Ridenour, it is possible he did assist Dr. LaPaglia by holding Mr. Booker down for a shot prior to leaving the hospital. Moreover, it is uncontroverted that Officer Ridenour was present when Dr. LaPaglia informed Mr. Booker that he would forcibly paralyze him and search his rectum if he did not consent.

In Mr. Booker's criminal case, the Sixth Circuit made clear that police may not bring a suspect to a purportedly independent actor and "stand by without interfering while the actor unlawfully batters the subject in a way that the police clearly could not. . . ." *United States v. Booker*, 728 F.3d at 540. "In some circumstances, this must be true no matter what the intent of the independent actor." *Id.* In such a situation, if the police merely stood by, "their actions would incur Fourth Amendment responsibility." *Id.* at 741.

Under the circumstances alleged, Officer Ridenour cannot escape liability by leaving the scene after he became aware that Dr. LaPaglia intended to forcibly paralyze and search Mr. Booker. Moreover, it is possible that Officer Ridenour assisted in the administration of the muscle relaxer by holding Mr. Booker down. To decide otherwise would be akin to allowing officers to throw a suspect into the lion's cage and escape liability by leaving the scene before the lion had the chance to injure the suspect; it would eviscerate the protections established by the Fourth Amendment. *Id.*

Because there are material questions of fact relating Officer Ridenour's role in the search, and because the type of search alleged violates clearly established constitutional rights, Officer Ridenour and Mr. Booker's cross motions for summary judgment will be denied.

### e) Anderson County

Anderson County contends it cannot be held liable under § 1983 because there was no policy or custom at the Anderson County Detention Facility that instructed, encouraged, or condoned taking prisoners suspected of hiding contraband in their rectums to Methodist Medical

Center for warrantless searches. Section 1983 does not allow plaintiffs to sue a local government under the theory of *respondeat superior*. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 692-94 (1988)). A plaintiff may only recover from the local government for its own wrongdoing. *Id.* Under *Monell*, the local government cannot be found liable unless the plaintiff can establish that an officially executed policy or the toleration of a custom leads to, causes, or results in the deprivation of a constitutionally protected right. *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691).

"A 'municipal' custom may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005) (quoting *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004)). *Monell* liability requires a showing that the custom is "so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* (quoting *Doe v. Claiborne County*, 103 F.3d at 507).

There is a genuine issue of material fact relating to Anderson County's policy with respect to searching prisoners suspected of having contraband hidden inside their rectums. Dr. LaPaglia testified he had searched Anderson County's prisoner's rectums on multiple occasions before Mr. Booker. Moreover, the officers did not transport Mr. Booker to the hospital until their supervisor made the final decision after placing a phone call with the district attorney's office. At this early stage in the case, without Mr. Booker having the benefit of discovery, these allegations are sufficient to create a genuine issue of fact and survive summary judgment. Accordingly, Anderson County and Mr. Booker's cross motions for summary judgment will be denied with respect to these claims.

### f) City of Oak Ridge

Like Anderson County, Oak Ridge contends it is entitled to summary judgment because it has not established a policy or custom that led to the violation of Mr. Booker's constitutional rights. The record is sparse because Mr. Booker has not had the opportunity to engage in discovery; however, Mr. Booker contends there was an incident in 2011 (after Mr. Booker's arrest and search) in which Oak Ridge's police officers brought a another young man suspected of concealing drugs in his rectum to Methodist Medical where Dr. LaPaglia used the same threats and intimidation to get consent to do a digital rectal exam.

23

While this one incident occurred after Mr. Booker's search, it could be part of a broader policy or method of operation. Without the opportunity to conduct discovery, it is no surprise Mr. Booker is unable to plead anything more concrete. Accordingly, Oak Ridge and Mr. Booker's cross motions for summary judgment will be denied with respect to these claims, and the parties will be permitted to proceed with discovery to determine what exactly Oak Ridge's policies and customs were.

**B. Motion to Reconsider Dismissal of Federal Claims Against Methodist and Nurse Jones**

In the first round of summary judgment motions, the Court dismissed Mr. Booker's federal claims against Methodist and Nurse Jones because *respondiat superior* liability is not available in § 1983 and because Nurse Jones was not a state actor. [R. 97, p. 5-6]. Mr. Booker has moved the Court to reconsider its decision.[8] [R. 157]. According to Mr. Booker, the facts he pled, if taken as true, are sufficient to create a genuine issue of material fact.

Though "motions to reconsider are not ill-founded step-children of the federal court's procedural arsenal, they are extraordinary in nature and, because they run contrary to notions of finality and repose, should be discouraged." *McConocha v. Blue Cross and Blue Shield Mur. of Ohio*, 930 F.Supp. 1182, 1184 (N.D. Ohio, 1996) (quoting *In re August, 1993 Regular Grand Jury*, 854 F.Supp. 1403, 1406 (S.D. Ind. 1994) (internal quotations omitted)). When a defendant simply views the law in a different light to the Court's view, its proper recourse is not a motion for reconsideration, but to appeal to the Sixth Circuit. *Dana Corp. v. United States*, 764 F.Supp. 482, 489 (N.D. Ohio, 1991).

An action by a private actor is only attributable to the federal government if there is a sufficiently close nexus between the state and the private actor's challenged action such that the action may be fairly treated as that of the state itself. *Blum v. Yaretsky*, 457 U.S. 991, 1004-12 (1982). Despite the Sixth Circuit's holding in Mr. Booker's criminal case, this Court's conclusion remains unchanged that Nurse Jones and Methodist were sufficiently removed from the evidentiary search to find they were state actors. Nurse Jones and Methodist may be liable under state law for what happened to Mr. Booker, but they are not state actors for the purposes of Fourth Amendment analysis.

---

[8] The Court also dismissed the § 1983 claims against Team Health, Inc. and Southeastern Emergency Physicians, Inc., but Mr. Booker does not seek reconsideration of those dismissals.

### C. State Law Claims

In the first round of summary judgment motions, the Court dismissed Mr. Booker's claims brought under the Tennessee Constitution and it dismissed Mr. Booker's claims brought under Tenn. Code Ann §§ 40-7-121 and 29-20-101 against Nurse Jones and Dr. LaPaglia because they are not governmental entities or employees of governmental entities as defined by Tenn. Code Ann. § 29-20-102(3).

Mr. Booker has also asserted causes of action for false arrest and imprisonment as well as malicious prosecution. However, to successfully prosecute a claim for false arrest and imprisonment, Mr. Booker must prove the unlawfulness of his detention or restraint. *Brown v. Christian Bros. University*, 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013). Similarly, the tort of malicious prosecution requires proving the defendant acted without probable cause. *Id.* Because the officers had probable cause to arrest Mr. Booker, his arrest was lawful and he cannot prevail on his false arrest and imprisonment or malicious prosecution claims. Accordingly, these claims will be dismissed.

Also in the first round of summary judgment motions, Mr. Booker urged the Court to decline exercising supplemental jurisdiction over his state law claims. Finding the state law claims closely intertwined with the issues currently before the Sixth Circuit, the Court held Mr. Booker's argument premature. [R. 97, p. 7].

Title 28 § 1367(c) provides that district courts may decline to exercise supplemental jurisdiction over state law claims when they raise novel or complex issues of state law or, in exceptional circumstances, there are compelling reasons for declining supplemental jurisdiction. The Tennessee Governmental Tort Liability Act provides in pertinent part: "[t]he circuit courts shall have exclusive original jurisdiction over any action brought under this chapter. . . ." Tenn. Code Ann. § 29-20-307. This expresses a clear preference from the Tennessee legislature that claims under Tennessee's Governmental Tort Liability Act be handled by state courts. *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000).

Accordingly, this Court declines to exercise supplemental jurisdiction over Mr. Booker's claims brought under the Tennessee Governmental Tort Liability Act. Because those claims are closely intertwined with the remaining state law claims asserted against the nongovernmental defendants, the Court declines to exercise supplemental jurisdiction over any of Mr. Booker's

remaining state law claims. Mr. Booker's remaining state law claims will be remanded to the Circuit Court for Anderson County, Tennessee.

### 6. Conclusion

For the foregoing reasons, **it is Ordered**:

1. Mr. Booker's motion for reconsideration, [R. 156], is **Denied**;

2. Dr. LaPaglia and Methodist's motions to strike, [R. 250, 251], are **Denied**;

3. Methodist's motion for leave to supplement its response, [R. 252], is **Granted**;

4. Officer Ridenour's motion for summary judgment, [R. 135], is **Granted in Part** with respect to claims for any actions leading up to the hospital visit, and **Denied in Part** with respect to Mr. Booker's claims relating to the hospital visit;

5. Officer Steakley and Oak Ridge's joint motion for summary judgment, [R. 144], is **Granted in Part** with respect to claims for any actions leading up to the hospital visit, and **Denied in Part** with respect to any remaining claims;

6. Deputy Shelton and Anderson County's joint motion for summary judgment, [R. 172], is **Granted in Part** with respect to claims for any actions leading up to the hospital visit, and **Denied in Part** with respect to Mr. Booker's remaining claims;

7. Dr. LaPaglia's motion for summary judgment, [R. 164], is **Denied**;

8. Tammy Jones and Methodist Medical Center's joint motion for summary judgment, [R. 137], is **Denied as Moot**;[9]

9. Mr. Booker's motion for summary judgment, [R. 153], is **Denied**;

10. Mr. Booker's § 1983 claims for actions leading up to the hospital visit are **Dismissed**;

11. Mr. Booker's state law claims for false arrest and imprisonment as well as malicious prosecution are **Dismissed**; and

12. Mr. Booker's remaining state law claims are **Remanded** to the Circuit Court of Anderson County, Tennessee.

UNITED STATES DISTRICT JUDGE

---

[9] Their motions for summary judgment relate solely to state law claims, which are being remanded to the Circuit Court of Anderson County.